UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GORELL DOUGLAS | ) | CASE NO. 1:13CV1282 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Gorell Douglas Disability Insurance Benefits (DIB). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in her February 15, 2012 decision in finding that Plaintiff was not disabled because he could perform his past relevant work as an electronics assembler (Tr. 20-33). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.   **PROCEDURAL HISTORY**

Plaintiff, Gorell Douglas, filed his application for DIB on July 16, 2010, alleging that he became disabled on December 7, 2009 (Tr. 23,86, 157-161). Plaintiff's application was denied initially and on reconsideration (Tr. 108-114). Plaintiff requested a hearing before an ALJ, and, on December 15, 2011, a hearing was held where Plaintiff appeared with counsel and testified before an

1

ALJ, and a Vocational Expert (VE) also testified.

On February 15, 2012, the ALJ issued her decision, finding Plaintiff not to be disabled because he was capable of performing his relevant work as an electronics assembler (Tr. 32-33). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-4, 17-19). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## **II.    STATEMENT OF FACTS**

Plaintiff was born on September 20, 1958, and was fifty-one years old on the alleged onset date of disability, and fifty-three years old at the time of the hearing (Tr. 86). He completed his GED and obtained an Associate's Degree in electrical engineering (Tr. 196, 407). His past relevant work includes work as an electronics assembler, electronics technician, building repairer, machine assembler, and service representative (Tr. 32, 49-60, 69-70, 235-242).

The Plaintiff alleges disability due to migraine headaches, stomach pains, and back pains (Tr. 195, 221).

## **III.    SUMMARY OF MEDICAL EVIDENCE**

Prior to his onset date, Plaintiff had a history of treatment for low back pain (Tr. 260, 269). He also had a history of treatment for migraine headaches, which he attributed to his exposure to an adhesive agent (Click Bond) when he last worked at General Electric (GE) as an electric technician (Tr. 49, 204, 263, 266, 287-295).

2

In regard to his lumbar and cervical spine condition, Paul J. Deuley, M.D., Plaintiff's primary care physician, examined and treated Plaintiff for several impairments during the relevant period, including complaints of low back and neck pain. On December 16, 2009, Dr. Deuley noted on examination that Plaintiff had no pain to palpation of his back (Tr. 267). On December 30, 2009, Plaintiff complained of increased neck pain after shoveling snow (Tr. 303). No abnormal findings were reported on examination (Tr. 303). On March 26, 2010, Plaintiff had pain palpable to his low back just below his S1 joints bilaterally (Tr. 304). His reflexes were without deficits (Tr. 304). Dr. Deuley prescribed Mobic for treatment (Tr. 304). A March 26, 2010 x-ray of Plaintiff's lumbar spine showed severe degenerative narrowing at L5-S1 with mild retrolisthesis of L5 on S1 (Tr. 316).

In an examination on April 26, 2010, Plaintiff had minimal pain to palpitation of his low back (Tr. 305). He had mild pain with straight leg raising on his left (Tr. 305). His reflexes were present without deficits noted (Tr. 305). An MRI scan of Plaintiff's lumbar spine showed a large disc herniation at L5-S1 that effaced the ventral thecal sac and likely contacted the bilateral S1 nerve roots, left greater than right (Tr. 318). There were also disc bulges with annular tears and herniations att L2-3 and L4-5, and mild scattered neural foraminal narrowing (Tr. 318). Dr. Deuley referred Plaintiff to Sami Moufawad, M.D. for pain management (Tr. 306).

Dr. Moufawad examined Plaintiff on June 2, 2010 (Tr. 332). Plaintiff's gait and stance were normal (Tr. 333). The orthopedic examination of Plaintiff's lumbar spine and lower extremities was normal, except for positive loading of the lower lumbar facets in his lower lumbar area and a positive extension test reproducing pain locally at his lower back area (Tr. 333). There were also multiple trigger points around Plaintiff's lower back area, along with tightness and soft tissue tenderness (Tr. 333). The neurological examination of Plaintiff's upper extremities was normal, except for a positive sign over his right median nerve at his wrist with no evidence of atrophy (Tr. 333). The neurological

examination of Plaintiff's lower extremities was also normal, except for pain inhibition at his pelvic girdle with hip flexion and adduction (Tr. 333). Dr. Moufawad diagnosed Plaintiff with bilateral lumbar dysfunction and spondylosis, lumbar myofascial pain, and lumbar herniated disc (Tr. 333). In follow-up examinations on June 30, 2010 and July 28, 2010, Plaintiff's physical examination remained the same (Tr. 335, 337). Dr. Moufawad prescribed Tramadol, as needed for pain, and recommended an epidural steroid injection, which Plaintiff refused (Tr. 338). Dr. Moufawad referred Plaintiff to Dr. George, an occupational medicine specialist, for further treatment (Tr. 338).

Dr. George examined Plaintiff on October 2, 2010 (Tr. 377). Plaintiff had pain in his lumbosacral area (Tr. 377). His motor examination was "okay" (Tr. 377). Dr. George renewed Plaintiff's medications (Tr. 377). In a further examination on January 3, 2011, Plaintiff reported ongoing low back pain (Tr. 375). Dr. George increased Plaintiff's Tramadol dosage (Tr. 375). He also referred Plaintiff to physical therapy (Tr. 384).

An x-ray of Plaintiff's cervical spine on December 30, 2010 showed disc space narrowing and hypertrophic changes at C6-7 with severe osteophytic impingement on the foramina at C6-7 and arthritic disease in the joints at C6-7 (Tr. 398).

Dr. Deuley re-examined Plaintiff on December 15, 2010 and January 28, 2011 regarding his complaints of pain in his low back and neck (Tr. 372-373). Plaintiff had some pain to palpitation of his left trapezius muscle (Tr. 373-373). He had no neurological deficits (Tr. 373-373). His strength was 5/5 throughout, and he was able to walk without difficulty (Tr. 373-373). Dr. Deuley prescribed Neurontin, in addition to Tramadol(Tr. 373). Dr. Deuley told Plaintiff that he did not consider him to be disabled (Tr. 372).

On January 18, 2011, Dr. George completed a form for GE regarding Plaintiff's application for long-term disability benefits (Tr. 384-385). Dr. George indicated that Plaintiff could not return

4

to his prior job, but that he could return to other employment with modifications (Tr. 384). Dr. George opined that Plaintiff could lift and carry twenty pounds occasionally and frequently; occasionally stand and walk; frequently sit; occasionally bend, stoop, twist, crouch, squat, reach below and above shoulder level; occasionally use vibrating tools; and continuously use his hands and fingers for repetitive movements (Tr. 385). Dr. George stated that kneeling, crawling, climbing, and balancing were not applicable (Tr. 385). He further opined that Plaintiff should not work around machines, electrical, chemicals, or unprotected height (Tr. 385).

An MRI of Plaintiff's cervical spine, taken on February 2, 2011, showed very mild ventral cord flattening at C6-7 from an osteophyte complex and mild to moderate foraminal narrowing (Tr. 399).

On February 15, 2011, Joshua Goldner, M.D., a pain management specialist, evaluated Plaintiff regarding his complaints of pain in his neck and low back (Tr. 358-359). On examination, Plaintiff's muscle strength was 5/5 throughout (Tr. 359). His range of motion of his cervical and lumbar spine was within normal limits, except for pain on flexion and extension of his lumbar spine (Tr. 359). He had mild facet tenderness at his bilateral lower lumbar area (Tr. 359). Plaintiff's reflexes were 2+ bilaterally in his upper and lower extremities (Tr. 359). His straight leg-raise test was negative bilaterally (Tr. 359). He had decreased sensation to pinprick at his left medial palm and left index finger (Tr. 359). He lost his balance when he tried to walk in a straight line, but was able to walk on his heels and toes (Tr. 359). Dr. Goldner diagnosed Plaintiff with several cervical and lumbar impairments (Tr. 359). Plaintiff agreed to undergo L5 epidural injections (Tr. 359). Dr. Goldner administered a series of injections to Plaintiff between February and April 2011 (Tr. 356-357, 405).

On July 14, 2011, Dr. Goldner noted that Plaintiff was doing very well subsequent to the epidural steroid injections (Tr. 403). Plaintiff had no gross neurologic deficits on examination (Tr. 403). On October 27, 2011, Plaintiff told Dr. Goldner that he wanted to repeat the lumbar injections (Tr. 402). Dr. Goldner observed no abnormal findings on examination, including no neurologic deficits (Tr. 402). Dr. Goldner agreed to repeat the lumbar injections in November 2011 (Tr. 402, 404).

In regard to his alleged migraine headaches, on December 30, 2009, Plaintiff reported to Dr. Deuley that he had not returned to work because of his headaches (Tr. 303). Dr. Deuley urged Plaintiff to follow up with a neurologist and an environmental medicine specialist (Tr. 303). She also told Plaintiff that she would not continue filling out disability paperwork for him, because there was no reason for him to be off work (Tr. 303). She prescribed Cymbalta and Imitrex, as needed, for Plaintiff's headaches (Tr. 303).

On January 13, 2010, Colleen Tomcik, M.D., a neurologist who had treated Plaintiff since June 2008, examined Plaintiff regarding his headaches (Tr. 285). Dr. Tomcik stated that Plaintiff's headaches had been previously triggered by exposure to the adhesive agent (Click Bond) that he used at work (Tr. 285). She noted, however, that Plaintiff had a recent unexplained increase in headaches, although they were starting to "break up" with Cymbalta (Tr. 285-286). Plaintiff's strength was 5/5 in his upper and lower extremities, with normal bulk and tone throughout (Tr. 286). His reflexes were +2 and symmetric in his upper extremities and knees, and absent at the ankles (Tr. 286). Sensation was intact to light touch distally in all four extremities (Tr. 286). He had a fine postural tremor in his hands, but rapid alternating movements were intact (Tr. 286). Plaintiff also had a normal casual gait (Tr. 286). Dr. Tomcik recommended an adjustment to Plaintiff's Cymbalta dosage (Tr. 286).

In addition to Dr. Tomcik, Plaintiff went to Daniel W. Miller, M.D., a neurologist, for treatment of his migraine headaches (Tr. 325-326). On January 20, 2010, Dr. Miller noted Plaintiff's explanation of Click Bond as the cause for his migraines (Tr. 325). However, Dr. Miller noted that Plaintiff had a history of migraines since childhood (Tr. 325). Plaintiff's strength was 5/5 throughout his upper extremities (Tr. 326). He had some marginally diminished pinprick sensation over his left dorsal ulnar area, but this was variable (Tr. 326). No other abnormalities were noted (Tr. 326). Dr. Miller recommended an additional trial of medications for Plaintiff's headaches (Tr. 326).

In April 2010, Plaintiff reported to Dr. Deuley that his migraines were milder and less frequent with Cymbalta and Imitrex (Tr. 305). Plaintiff reported getting only two headaches on a weekly basis since not working (Tr. 305).

Between March 2010 and July 2010, Todd S. Hochman, M.D., an internist, examined Plaintiff for a possible inhalation injury related to Plaintiff's exposure to Click Bond while employed at GE (Tr. 348-351). Dr. Hochman noted that Plaintiff's headaches had decreased since he stopped working and avoided exposure to Click Bond (Tr. 351).

On July 15, 2010, Plaintiff reported to Dr. Miller that he was getting headaches two to three times a week, but that Imitrex was working well (Tr. 322). Plaintiff complained of occasional paresthesias in his fingertips (Tr. 322). Plaintiff was ambulatory without assistive devices (Tr. 322). His motor examination revealed 5/5 motor strength in his hand muscles with some decreased pinprick sensation in his right hand fingers, suggestive of carpal tunnel syndrome (Tr. 322-323). Dr. Miller noted the MRI of Plaintiff's lumbar spine showed a large disc herniation at L5-S1 (Tr. 322-323). He told Plaintiff that lumbar discs sometimes recede spontaneously (Tr. 323). He stated that Plaintiff's L5/S1 disc herniation did not appear to be compressing the nerve structures to any critical degree that would require urgent consideration of surgery (Tr. 232). Dr. Miller refilled Plaintiff's Imitrex (Tr.

7

323).

On November 30, 2010, Plaintiff reported to Dr. Miller that his headaches improved about eighty percent (Tr. 353). Plaintiff was ambulatory without assistive devices (Tr. 352). His motor examination revealed a normal tone and 5/5 muscle strength in both his lower extremities and his hand muscles (Tr. 352). Plaintiff's tendon reflexes were symmetrical at 2+ at the knees and 1+ at the ankles (Tr. 352). Sensory examination revealed diminished pinprick sensation over Plaintiff's index fingers bilaterally (Tr. 352).

Plaintiff reported to Dr. Miller that his main concern was whether his collective conditions would be enough to warrant a disability (Tr. 353). Dr. Miller told Plaintiff that he did not think the disc herniation was sufficient grounds for disability if the disc was not causing weakness, bladder dysfunction, or intractable pain (Tr. 353). Dr. Miller noted that Plaintiff's lower extremity strength appeared normal, and that his only evidence of bladder dysfunction was somewhat increased frequency (Tr. 353). Dr. Miller told Plaintiff that he could not be sure whether he had carpal tunnel syndrome, and that he should stop smoking (Tr. 353).

On December 15, 2010, Dr. Deuley noted that Plaintiff had been seeing Dr. Miller for his headaches and that they were markedly improved from what they had been (Tr. 373). Plaintiff was only taking Tramadol on an as-needed basis (Tr. 373).

On March 24, 2011, Myung Cho, M.D., a State agency medical consultant, reviewed Plaintiff's case at the reconsideration level (Tr. 101-103). Dr. Cho concluded that Plaintiff's degenerative disc disease did not meet or equal Listing 1.04, and that Plaintiff retained the physical residual functional capacity (RFC) to perform a range of light work (Tr. 106). Dr. Cho opined that Plaintiff could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds (Tr. 102). She also opined that Plaintiff could stand and/or walk four hours; sit about six hours in an

8

eight-hour day; occasionally climb ramps/stairs, but never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and needed to avoid all exposure to hazards, such as machinery and heights (Tr. 103).

Subsequent to the ALJ's decision of February 15, 2012, Plaintiff submitted additional medical evidence to the Appeals Council (Exhibits 19F to 23F) (Tr. 4-6, 411-460). The additional evidence consisted of further records from Dr. George regarding Plaintiff's physical therapy between March and April 2011 (Tr. 412-431). There were also records from Dr. Goldner, showing that Plaintiff received additional epidural injections in February and April 2012 (Tr. 456-468). In addition, there were other records from Dr. Miller dated September 29, 2011 to October 2012, showing ongoing treatment of Plaintiff's migraines and other symptoms (Tr. 446-452). There was also an updated MRI report of Plaintiff's cervical spine taken on October 4, 2012, which showed a normal cord signal without cord compression, and a stable disc at C6-7 (Tr. 454). Plaintiff also submitted records from a psychiatrist, dated January 12, 2010 to April 16, 2010 (Tr. 441-445). The Appeals Council concluded that none of this additional evidence provided a basis for changing the ALJ's decision (Tr. 2).

## IV.    **SUMMARY OF TESTIMONY**

Plaintiff testified that he drove a little and used public transportation (Tr. 46-47). He stated that he helped out around the house, including doing some cleaning, taking out the garbage, washing dishes, doing laundry, and occasionally mowing the grass (Tr. 47). Plaintiff explained that he started out as an electronics assembler for GE and worked his way up to being an electronics technician, the job where he claims to have developed the bad migraine headaches (Tr. 49-51). Plaintiff also testified that he got migraine headaches about once every week or every two weeks (Tr. 61). He also testified

that he had constant low back and neck pain (Tr. 61-64). Plaintiff thought that he could lift between twenty and thirty pounds, sit for up to two hours before needing to get up, and stand about a half-hour at a time (Tr. 66). He also testified that he was still receiving unemployment benefits, and that he was applying for jobs around his neighborhood, particularly in building maintenance (Tr. 67).

A VE testified that Plaintiff had several jobs in the past, including electronics assembler and electronics technician (Tr. 69). The VE stated that both jobs were classified under the Dictionary of Occupational Titles (DOT) as light, semi-skilled occupations, and that, as actually performed by Plaintiff, the electronics assembler job was done at both a light and sedentary level, and the electronics technician job only at a light level (Tr. 69). The VE was asked to assume a hypothetical individual with the same vocational profile of Plaintiff, who could occasionally lift twenty pounds and frequently lift ten pounds, stand and walk four hours out of an eight-hour workday, sit for six hours, occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds, frequently balance, occasionally stoop, kneel, crouch, and crawl, and must avoid all exposure to hazards, such as machinery and heights (Tr. 72-73). The VE testified that such individual could perform his past work as an electronics assembler as generally performed and as Plaintiff actually performed it (Tr. 73).

### V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c)(1992);

10

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See,*

*Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

**VII.** **ANALYSIS**

Plaintiff asserts three issues:

A. WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S HOLDING THAT PLAINTIFF'S COMBINED IMPAIRMENTS DO NOT MEET OR EQUAL A LISTING.

B. WHETHER THE ALJ VIOLATED THE TREATING PHYSICIAN RULE.

C. WHETHER THE ALJ IMPROPERLY RELIED ON AN INCOMPLETE HYPOTHETICAL QUESTION TO THE VOCATIONAL EXPERT TO REACH HER DECISION.

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 7, 2009, and that he had several impairments that qualified as severe, including degenerative disc disease of his cervical and lumbar spine and migraine headaches (Tr. 25). The ALJ found that none of these impairments met or equaled the criteria of any of the listed impairments in the Listing of Impairments (the "Listings"), found at 20 C.F.R. pt. 404, subpt. P, app. 1, including Listing 1.04 (Tr. 27). The ALJ further found that Plaintiff retained the RFC to perform a wide range

of light work consistent with the limitations presented to the VE (Tr. 27). Based on this RFC and the VE testimony, the ALJ concluded that Plaintiff was capable of performing his past relevant work as an electronics assembler, and, therefore, was not disabled under the Act (Tr. 32-33). 20 C.F.R. 404.1520(e) and 416.920(e) (1992).

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff's degenerative disc disease did not meet or medically equal Listing 1.04. The ALJ correctly determined that his spinal impairments did not meet or equal all of the required criteria under Listing 1.04A (Pl.'s Br. at 12-16). The purpose of the Listings is to describe impairments severe enough to prevent a person from engaging in "any gainful activity," regardless of his age, education, or work experience. 20 C.F.R. Section 404.1525(a).

The burden of demonstrating that an impairment meets or equals a listed impairment rests with the claimant. *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2011). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Id.* at 531.

Listing 1.04A describes certain musculoskeletal impairments of the spine and provides, in part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

13

>reflex loss and, if there is involvement of the lower back positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1, Section 1.04A.

In this case, the ALJ correctly found that Plaintiff's impairments did not meet Listing 1.04 because there was no evidence of nerve root compression (Tr. 27). The ALJ's finding was supported by the medical evidence. As Listing 1.04A provides, the "evidence of nerve root compression" must be shown by specific medical findings. These specific medical findings did not exist during the relevant period from December 7, 2009 through February 15, 2012. Hence, Plaintiff did not have the motor loss necessary to meet Listing 1.04.

In December 2009, Dr. Deuley reported that Plaintiff had normal examinations (Tr. 267, 303). In January 2010, Dr. Tomcik reported that Plaintiff had 5/5 muscle strength in his upper and lower extremities with normal bulk and tone (Tr. 286). In January 2010 and July 2010, Dr. Miller reported that Plaintiff had normal bulk and 5/5 strength in his upper extremities, including his hand and finger muscles (Tr. 322, 326). In November 2010, Dr. Miller reported that Plaintiff had normal tone and 5/5 muscle strength in his lower extremities, as well as 5/5 strength bilaterally in his hand muscles (Tr. 352). In December 2010 and January 2011, Dr. Deuley reported that Plaintiff had no neurological deficits (Tr. 372-373). In February 2011, Dr. Goldner reported that Plaintiff's muscle strength was 5/5 throughout, and, in July 2011 and October 2011, he reported that Plaintiff had no neurologic deficits (Tr. 359, 402-403). Therefore, based upon the medical evidence, Plaintiff did not meet a fundamental part of Listing 1.04A.

In addition, in regard to reflex loss, although there were a couple of findings of absent or decreased reflexes in Plaintiff's ankles (Tr. 286, 356), most of the examinations showed that all of Plaintiff's reflexes were present without deficits (Tr. 304-305, 359, 372-373). Furthermore, with regard to sensory loss, although there were some findings of decreased pinprick sensation in Plaintiff's hand and/or fingers, it was associated with Plaintiff's carpal tunnel syndrome, and not his cervical

14

spine impairment (Tr. 322-323, 326, 352). Many of the examinations did not report any sensory deficits, and there was no evidence of any sensory loss related to Plaintiff's lumbar disc impairment (Tr. 267, 286, 303-305, 372-373, 402-403). There was only one report of "mild pain" with straight leg raising on Plaintiff's left (Tr. 305).

Furthermore, since Plaintiff did not have the requisite "nerve root compression," as defined in Listing 1.04A, the ALJ was correct in finding that he did not meet Listing 1.04. The ALJ's conclusion was supported by Dr. Cho, the State agency medical consultant, who similarly found that Plaintiff's impairments did not meet Listing 1.04 (Tr. 101, 106).

Also, Dr. Miller stated that Plaintiff's herniated disc at L5-S1 did not appear to be compressing the nervous structures to any critical degree (Tr. 323). Dr. Miller did not believe Plaintiff's lumbar disc herniation was sufficient grounds for disability because the disc did not cause, *inter alia*, weakness (Tr. 353). Hence, the ALJ's finding that Plaintiff did not meet the requirements of Listing 1.04 was supported by the record.

Next, the Plaintiff argues that the ALJ should have found that his impairments were medically equivalent to Listing 1.04A (Pl.'s Br. at 14-15). An impairment is medically equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listing findings. 20 C.F.R. Section 404.1526(a). Again, it is a claimant's burden to demonstrate that he has an impairment that is medically equivalent to a listed impairment. *Foster*, 279 F.3d at 354.

In this case, Plaintiff has not shown any findings that are of equal medical significance to the required criteria in Listing 1.04A or any other analogous listed impairment. Since such evidence was lacking, the ALJ was correct in finding that Plaintiff's impairments did not medically equal Listing 1.04. According to Dr. Cho, the only medical source who considered this issue, concluded that Plaintiff did not have an impairment or combination of impairments that medically equaled the criteria in Listing 1.04 (Tr. 101, 106).

15

Next, Plaintiff argues that the ALJ erred in not obtaining an updated opinion from a medical expert on this issue (Pl.'s Br. at 15-16).  The ALJ is not required to obtain an updated medical opinion unless (1) the ALJ determines, in the absence of additional evidence, that the symptoms, signs, and laboratory findings suggest that a judgment of equivalence may be reasonable; or (2) the ALJ determines, in the presence of additional evidence, that it may change the State agency medical consultant's finding that the impairment is not equivalent in severity to a listed impairment. *See* Social Security Ruling (SSR) 96-6p, 1996 WL 374180, at *3-*4 (S.S.A.).

In this case, Plaintiff argues that an updated opinion was required because Dr. Cho did not have the cervical spine x-ray and MRI when she gave her opinion (Pl.'s Br. at 15; Tr. 398-399). However, notwithstanding what was shown on these reports, the ALJ was able to correctly conclude, based on his review of objective physical examinations, that Plaintiff did not have medical findings that were equal in severity to those required under Listing 1.04 to show "evidence of nerve root compression." The ALJ had the benefit of statements and opinions from several medical sources when he made his finding as to whether Listing 1.04 was met or equaled.  The ALJ's decision that Plaintiff did not meet or equal a listed impairment was also supported by the fact that no treating source concluded that Plaintiff had incapacitating or debilitating symptoms that precluded him from performing "any gainful activity."  In fact, Dr. Deuley stated that she did not consider Plaintiff to be disabled, and Dr. George opined that Plaintiff retained the capacity to perform some gainful work, notwithstanding his limitations (Tr. 303, 373-373, 384-385).  Furthermore, Plaintiff's testimony that he was still applying for jobs, mostly in the area of building maintenance, further undermined his argument that he had a listing-level impairment.  Hence, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal Listing 1.04.

Plaintiff also argues that the ALJ did not properly evaluate Dr. George's opinion, despite according it great weight (Pl.'s Br. at 16-19).  However, an ALJ will evaluate every medical opinion

16

received in light of a variety of factors, including the nature of the treatment relationship, if any, the supportability and consistency of the opinion with the rest of the record, the physician's specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. Section 404.1527(c). A physician's opinion, however, even one from a treating source, does not bind the ALJ on issues reserved to the ALJ, such as a claimant's RFC or whether a claimant is able to work. *See* 20 C.F.R. Sections 404.1527(c)(1)-(3); SSR 96-5p, 1996 WL 374183 at *2 (S.S.A.).

The ALJ correctly gave considerable weight to Dr. George's assessment of Plaintiff's functional abilities and limitations (Tr. 30, 384-385). Dr. George opined that Plaintiff could "return to work" with modifications (Tr. 30). The modifications identified by Dr. George were consistent with a wide range of light work and reasonably reflected in the ALJ's RFC findings (Tr. 27).

Plaintiff contends that the ALJ erred because she gave the same great weight to Dr. Cho's opinion that she accorded to Dr. George's opinion (Tr. 30-31, 102). Plaintiff argues that there were differences between the two opinions (Pl.'s Br. at 17). However, notwithstanding the alleged differences, it did not preclude the ALJ from giving both opinions great weight. The ALJ's RFC finding was consistent with Dr. George's opinion. The ALJ may reasonably adopt portions of a medical opinion and reject others in making an RFC determination. *See, Carroll v. Comm'r of Soc. Sec.*, No, 1:09cv2910, 2011 WL 3648128, at *10 (N.D. Ohio Aug. 18, 2011).

In this case, any differences between the ALJ's RFC finding and Dr. George's opinion were not significant in regard to whether Plaintiff was disabled. It should be noted that Dr. George opined that Plaintiff retained the capacity to do some work, and that he could work an eight-hour day for a total of forty hours in a week (Tr. 384-385).

Furthermore, Dr. George opined that Plaintiff could occasionally lift/carry up to twenty pounds, and he also opined that Plaintiff could occasionally bend, stoop, crouch, and squat, and that he could sit frequently (i.e., up to five hours a day), which were consistent with the ALJ's RFC finding

17

(Tr. 27, 385). The ALJ's finding that Plaintiff could stand and/or walk for four hours was also supported by Dr. George's opinion (Tr. 27). Dr. George opined that Plaintiff could stand and walk each on an occasional basis (Tr. 385). This meant that Plaintiff could stand and walk up to five hours, which was more than the ALJ's RFC finding of four hours standing and/or walking (Tr. 27).

Although there have been some minor differences between Dr. George's opinion and the ALJ's finding, it did not preclude the ALJ from according Dr. George's opinion great weight (Tr. 30).

Furthermore, it was also not erroneous for the ALJ to accord great weight to Dr. Cho's opinion (Tr. 30-31). *See* 20 C.F.R. Section 404.1527(e)(2)(I). Here, the ALJ explained that she accorded great weight to Dr. Cho's opinion because it was consistent with the evidence as a whole, including Dr. George's opinion in particular, i.e., both physicians believed that Plaintiff could work (Tr. 31). The ALJ also found Dr. Cho's opinion consistent with Plaintiff's testimony that he was able to lift twenty to thirty pounds, and his reports of being able to perform household chores, shovel snow, drive, and shop (Tr. 47, 66, 245-247).

Based on the opinion from the VE, the ALJ correctly concluded that Plaintiff could perform his past work as an electronics assembler as generally performed and as Plaintiff actually performed it (Tr. 32-33, 73). A claimant is not considered disabled if he can do his previous work, either as he actually performed it, or as generally performed in the national economy. 20 C.F.R. Section 404.1520(e).

However, Plaintiff argues that the hypothetical question relied upon by the ALJ was incomplete because (1) it did not take into account his migraine headaches, which he claimed caused him to miss work or to be tardy more than two times a month, and (2) did not take into account his exposure to pulmonary irritants (Pl.'s Br. at 20-21).

First, with regard to Plaintiff's migraine headaches, the frequency of those headaches varied over time (Pl.'s Br. at 20-21). The ALJ recognized that Plaintiff had such headaches, but, as she

18

noted, even his own treating physicians, Drs. Deuley and Miller, did not believe that his headaches precluded him from returning to work (Tr. 303, 353, 373). In April 2010, Plaintiff reported that his migraines were milder and less frequent with prescribed medications (Tr. 305). In July 2010, Plaintiff told Dr. Miller that he was getting headaches two to three times a week, but that generic Imitrex was working well (Tr. 322). In November 2010, Plaintiff reported to Dr. Miller that his headaches improved by about eighty percent (Tr. 353). In December 2010, Plaintiff told Dr. Deuley that his headaches had markedly improved with mediation (Tr. 373). None of Plaintiff's physicians described Plaintiff's migraine headaches as debilitating. Therefore, based upon the evidence about Plaintiff's headaches, the ALJ did not have to accept the VE's testimony to the alternative hypothetical question that Plaintiff would be unemployable if, because of headaches, he would miss work or be tardy for work four to six times a month (Tr. 74).

Next, with regard to pulmonary irritants, i.e., Click Bond, that allegedly exacerbated Plaintiff's headaches, the ALJ made no error. The ALJ did not find that Plaintiff could return to his past work as an electronics technician, if he was exposed to Click Bond (Tr. 235, 263, 267, 287, 290). Under the DOT, "toxic caustic chemicals" are generally not present for the occupation of an electronics assembler. *See* DICOT 726.684-018, 1991 WL 679596 (G.P.O.). Thus, the absence of any pulmonary irritants from the ALJ's hypothetical question was not in error. *See, Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230 (6th Cir. 1993). Finally, the Court concludes that the ALJ's decision followed the law and is based upon substantial evidence.

## **VIII. CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional

19

capacity (RFC) to perform his past relevant work, and, therefore, was not disabled.  Hence, he is not entitled to DIB.

Dated: June 20, 2014            */s/George J. Limbert*
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE